# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | No. 07-010-1 |
| | : | |
| RICHARD WILLIAMS | : | |
| | : | |
| | : | |

**September 26, 2023**                                                                              **Anita B. Brody, J.**

### MEMORANDUM

On December 19, 2006, Richard Williams was 21 years old. That day, he was arrested for unlawfully possessing a firearm. He was sentenced to a 15-year prison sentence, and he was released on February 16, 2020. At age 34, he began to serve the second part of his sentence: a five-year period of supervised release.

Williams remains under the supervision of the Probation Office, with which he has limited contact. He is required to report to his officer every three months. Since his release, Williams has rebuilt his life. He has a steady job and stable housing, and he has maintained sobriety. Now, the most prominent role that his supervision has in his life is to hamper his further re-integration into society. He is ineligible for promotion at work due to his status as a supervisee. By holding him back from this potential advancement, Williams' current experience of supervised release is at odds with probation's rehabilitative purpose.

Williams now moves to terminate his period of supervision. The Government and the Probation Office both oppose this motion. Williams' motion will be granted, and Williams' period of supervised release will be terminated.

1

I. **BACKGROUND**

On January 9, 2007, a grand jury returned a one-count indictment charging Richard Williams with possession of a firearm by a person with a prior felony conviction. Indictment, ECF No. 7; 18 U.S.C. § 922(g)(1). On October 3, 2008, Williams pled guilty to this charge. Plea Doc., ECF No. 44. His conviction carried with it a 15-year mandatory minimum sentence. *Id.* at 2; 18 U.S.C. § 924(e). On January 23, 2009, I sentenced Williams to 15 years' imprisonment, with five years of supervised release to follow. Judgment, ECF No. 53. On February 16, 2020, Williams completed this term of imprisonment and began his term of supervised release. Defendant's Motion for Early Termination of Supervised Release ("Def. Mot."), ECF No. 73, at 3.

Over the last three years, Williams has complied with the conditions of his release. Def. Mot. at 2; Government's Opposition To Defendant's Motion ("Gov't Opp'n."), ECF No. 76, at 5. He has incurred no violations of supervision. Gov't Opp'n. at 5. He has been prompt and respectful at his meetings with his probation officer, which occur approximately every three months. *Id.* He has maintained steady full-time employment, including during the COVID-19 pandemic. *Id.*; Def. Mot. at 4. Williams has fulfilled his financial obligations. Gov't Opp'n. at 5–6. He has also maintained a stable residence with his sister. Def. Mot. at 4. Despite a history of drug use and addiction dating back to his young teenage years, Williams is now sober. Def. Mot. at 3. The Probation Office has classified Williams as a "low/moderate risk level offender." *Id.* The Government agrees that he has been successful on supervised release. Gov't Opp'n. at 6 ("The defendant's performance while on supervision has indeed been impressive, as have his attempts to better himself and his life."). Williams is currently in the 44th month of his 60-month period of supervision. This period is scheduled to terminate on February 17, 2025. Gov't Opp'n. at 5.

Williams now moves for early termination of his period of supervised release. Def. Mot. at 2. Williams currently works as an assistant manager at Amazon's 4101 Sansom Street facility. *Id.* at 4. He alleges that he is qualified for higher managerial positions at Amazon, but that he is ineligible for promotion because of his active status as a supervised releasee. *Id.* Williams argues that terminating his supervision to allow him to pursue greater financial stability is in the interest of justice. *Id.* at 8. He contends that terminating his period of supervised release also serves the purposes of the Probation Office by freeing up that office's resources and by furthering Williams' reintegration into society. *Id.* at 9–10.

The Government opposes Williams' motion. Gov't Opp'n. at 1. The Government urges the Court to deny Williams' motion for two reasons: first, that Williams has not demonstrated a change in circumstances to warrant early termination, and second, that early termination for mere compliance with supervised release undermines the goals of sentencing. *Id.* at 4–5.

## II.   LEGAL STANDARD

After completing one year of a term of supervised release, a defendant may seek to terminate the remaining term of supervision. 18 U.S.C. § 3583(e)(1). When evaluating motions for early termination of supervised release, courts begin by considering the following subset of the statutory sentencing factors:[1]

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed— …
>     (B) to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>     …

---

[1] Two statutory sentencing factors are excluded from this analysis: the seriousness of the offense and the adequacy of the defendant's punishment. 18 U.S.C. § 3583(e)(1); §§ 3553(a)(2)(A), (a)(3). This omission aligns with probation's primary purpose, which is "to facilitate the integration of offenders back into the community rather than to punish them." *United States v. Sheppard*, 17 F.4th 449, 454 (3d Cir. 2021) (citations omitted).

(4) the kinds of sentence and the sentencing range established for—. . . [the particular defendant and particular conviction or violation]
(5) any pertinent policy statement— . . . [issued by the Sentencing Commission]
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); *see* 18 U.S.C. § 3583(e)(1) (specifying which of the Section 3553(a) factors to apply). The court does not need to make specific factual findings as to each of these factors. *United States v. Melvin*, 978 F.3d 49, 52–53 (3d Cir. 2020). Instead, a court's statement that it considered these factors in its analysis is sufficient. *Id.*

After reviewing these factors, the court must determine whether the person's conduct warrants early termination, and whether early termination is in the interest of justice. 18 U.S.C. § 3583(e)(1). Courts have broad discretion in deciding these questions, and they should grant these motions liberally. *Melvin*, 978 F.3d at 52; U.S.S.G. § 5D1.2, cmt. n.5 ("The court is encouraged to exercise this authority [to terminate supervised release] in appropriate cases.").

It is the defendant's burden to show that they qualify for early termination. *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989). This is a low burden. A Court "need not find that an exceptional, extraordinary, new, or unforeseen circumstance warrants early termination of a term of supervised release before granting a motion under 18 U.S.C. § 3583(e)(1)." *Melvin*, 978 F.3d at 53; *accord. United States v. Mabry*, 528 F. Supp. 3d 349, 359 (E.D. Pa. 2021) ("[T]he mere absence of such a change or extraordinary circumstances is not a basis for den[ial]."). A defendant's compliance with the terms of his release has been found to sufficiently justify early termination. *Mabry*, 528 F. Supp. 3d at 359.

### III. DISCUSSION

Williams moves to terminate his supervised release pursuant to 18 U.S.C. § 3583(e)(1). Williams has served more than one year of supervised release, so he is statutorily eligible to apply

for early termination. *Id.* The Court will consider the factors listed in 18 U.S.C. § 3553(a) and evaluate whether Williams' conduct and the interest of justice favor early termination. 18 U.S.C. § 3583(e)(1).

### A. Section 3553(a) Factors

The first factor (the nature and circumstances of the offense and the history and characteristics of the defendant), when applied to Williams, favors early termination of his supervised release. Williams' conviction is for a nonviolent offense that occurred in 2006, when he was 21 years old. Presentence Investigation Report ("PSR") at 2, 3 (on file with Court). He had a childhood that included drug addiction and involvement with the criminal legal system. PSR at 6–8, 12. After serving his lengthy mandatory minimum sentence, he is now sober and has stable housing and employment. Def. Mot. at 3, 4. This degree of successful reintegration into society indicates that Williams has no further need for supervision.

The second factor (the need for the sentence imposed to deter criminal conduct, protect the public, and provide the defendant with training or care) likewise favors termination. The Probation Office's classification of Williams as a low/moderate risk offender means that Williams has appointments with an officer once every three months. The Government does not provide any basis for finding that Williams' remaining scheduled appointments would play a significant role in either preventing re-offense or assisting Williams' reintegration into society. Moreover, Williams does not present a risk to the public. He does not have a single violent conviction on his record. *See* PSR. In 43 months of supervised release, he has not had a single violation. Williams is now 38 years old, meaning he has likely "aged out" of criminal activity.[2]

---

[2] "Aging out" of crime refers to the well-studied phenomenon that as an adult's age increases, the likelihood that they will commit crimes decreases. *See* Caitlin V.M. Cornelius, Christopher J. Lynch & Ross Gore, *Aging Out of Crime: Exploring the Relationship Between Age and Crime with Agent Based Modeling*, SOCIETY FOR MODELING & SIMULATION INT'L, 1 (2017) ("Crime increases throughout adolescence and then peaks at age 17 . . . and then begins

The third factor is the kind of sentence and sentencing range established for Williams. The guideline range for Williams' supervised release was between three and five years. PSR at 14 (citing U.S.S.G. § 5D1.2(b)(1)). Williams has already completed over three years of supervised release, so he has already served a sentence within the applicable guidelines range.

The fourth factor urges review of applicable policy statements from the Sentencing Commission. The policy statements favor early termination. The commentary to § 5D1.2 of the Sentencing Guidelines confirms that courts are encouraged to exercise their authority to terminate supervised release, where appropriate. *See* U.S.S.G. § 5D1.2, cmt. n.5.

The fifth factor (the need to avoid disparities between similarly-situated defendants) favors termination. Indeed, failing to terminate Williams risks putting him in a worse position than his peers. In *United States v. Mabry*, Mabry's term of supervised release was terminated after he served a lengthy prison sentence and completed the majority of his term of supervised release. 528 F. Supp. 3d 349, 352 (E.D. Pa. 2021). He, too, was employed and had a stable residence. *Id.* at 358. Likewise, in *United States v. Tarboro*, Tarboro received early termination because of his full-time work, stable residence with family, and compliance with the Probation Office. No. 08-323-01, 2023 WL 3821812, at *4 (E.D. Pa. June 5, 2023).

The sixth and final factor (the need to provide restitution to any victims of the offense) is inapplicable to Williams' case. There was no victim of the offense. PSR at 4. The Government raises a concern that Williams' early termination would serve to decrease transparency in sentencing and offend the expectations of victims. Gov't Opp'n. at 5. These arguments both fail. The Sentencing Commission notes that courts may consider the possibility of early termination

---

to decrease over the life course moving forward. This trend has, over the years, withstood stringent testing and examination across time periods and maintains consistent results regardless of race/ethnicity, education level, or income.") (citations omitted).

when first sentencing a criminal defendant. U.S. SENTENCING COMM'N, PRIMER ON SUPERVISED RELEASE, at 15 (2023). Using a statutory tool—one that victims and defendants may be advised of from the start—does not contradict principles of transparency or predictability in sentencing. In Williams' case in particular, no victim exists to have their expectations undercut.

When considered together, these factors heavily favor terminating Williams' period of supervised release.

### B. Williams' Conduct

Next, the Court turns to the question of whether Williams' conduct merits early termination of supervised release. 18 U.S.C. § 3583(e)(1). The Government does not contest that Williams has been compliant with his conditions of release, or that he has been successful in reintegrating into society. Gov't Opp'n. at 6. The Government contends, however, that Williams must show a change in circumstances—something more than compliance—to justify early termination. *Id.* at 4.

The statute does not require Williams to show changed circumstances. His good conduct alone satisfies this prong of the analysis. The Third Circuit has "disavow[ed] any suggestion that new or unforeseen circumstances must be shown" before a court grants early termination of supervised release. *Melvin*, 978 F.3d at 53. Williams has been a model probationer, and his successful completion of over three years of supervised release is sufficient to satisfy the requirement of conduct meriting release.

Changed circumstances, however, can be compelling information for courts to consider in their "discretion to consider a wide range of circumstances" when making these decisions. *Id.* at 52. The Third Circuit has noted that generally, early termination will only be proper where new circumstances have arisen. *Id.* at 53. This follows intuitively: a defendant who is in the same position now as when he first committed a crime could be at risk for recidivating. Here, Williams'

life has changed substantially since the date of his offense in 2006 and since his sentencing hearing in 2008. He is employed and sober, and he has been offense-free for nearly 17 years. He also now has the potential for advancement at work.

The Government expresses concern that terminating Williams' release would unduly reward him for just doing "what the law expects." Gov't Opp'n. at 6.[3] But it is not clear what greater success Williams could have achieved. Williams' conduct under supervision achieves the Probation Office's ultimate goal: Williams' re-integration into society. "Congress intended supervised release to assist individuals in their transition to community life." *United States v. Johnson*, 529 U.S. 53, 59 (2000); *see also* S. Rep. No. 98–225, at 124 (1983) ("[T]he primary goal [of supervised release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense[.]"). Williams' lack of dependence on continued supervision constitutes a success not only for Williams, but also for the Probation Office. Williams' conduct merits early termination of his term of supervised release.

C. **Interest of Justice**

Finally, the Court considers whether early termination is in the interest of justice. 18 U.S.C. § 3583(e)(1). The phrase "interests of justice" contemplates "a peculiarly context-specific inquiry." *Martel v. Clair*, 565 U.S. 648, 663 (2012) (interpreting the phrase in the context of habeas corpus relief). The "interest of justice" could plausibly re-encompass all the relevant factors in 18 U.S.C. § 3553(a). Interpreting "interest of justice" in that way would fail to give this phrase a

---

[3] The Government cites *United States v. Guilliatt*, No. 01-408, 2005 WL 589354, at *1 (E.D. Pa. 2005) for the proposition that compliance with the terms of supervised release is, by itself, insufficient to merit early termination. That decision relied on a past policy of the Administrative Office for the U.S. Probation Office stating that early termination should be ordered only in extraordinary circumstances. *Id*. In the years since *Guillatt* was issued, that reasoning has been undercut in two ways: subsequent case law rejects this high burden, and a study in the Federal Probation Journal showed that early termination saves money without compromising public safety. *See Melvin*, 978 F.3d at 53; Laura M. Baber & James L. Johnson, *Early Termination of Supervision: No Compromise to Community Safety*, 77 FED. PROB. J. 17 (2013).

separate meaning. Having already examined several factors specific to Williams' own history and circumstances by way of the factors in Sections 3553(a) and 3583(e)(1), I give meaning to "interest of justice" by analyzing Williams' motion in light of the interests of the Probation Office and of the public.

Williams' probation officer apparently opposes release based on his past criminal record. Def. Mot. at 1 n.1. However, the Probation Office has not submitted a report detailing Williams' current risk level or the propriety of terminating his period of supervision. To determine the interests of the Probation Office, I will analyze whether Williams' motion aligns with the overall mission of probation services.

1. **Probation's History and Purpose**

John Augustus is widely considered the "father of probation." Charles Lindner, *The Path to Statutory Probation in the United States and England*, 71 FED. PROB. J. 36, 37 (2007). In 1841 Massachusetts, Augustus began to sponsor criminal defendants and help them rehabilitate. His first probationer, a man charged with being a "common drunkard," returned to court for sentencing after three weeks in Augustus' care. *Id.* His "whole appearance was changed and no one, not even the scrutinizing officers, could have believed that he was the same person." *Id.* (citation omitted). The judge sentenced him to a fine of one cent in lieu of the usual sentence of imprisonment. *Id.* Augustus expanded and continued his work. *Id.* at 38. He assisted probationers in finding housing, employment, and schooling. *Id.* He frequently employed defendants in his shop for several weeks so that they would finish probation with new technical skills. *Id.* Those probationers without a place to stay were welcomed into Augustus' home. *Id.* Augustus coined the term "probation," drawing on a Latin root and English royal tradition to provide a word relating to "a period of proving oneself and subsequent forgiveness." *Id.*

In 1891, the influence of Augustus' work led Massachusetts to create the first state probation office. Miriam Krinsky & Monica Fuhrmann, *Building a Fair and Just Federal Community Supervision System: Lessons Learned from State and Local Reform Efforts*, 34 FED. SENT. R. 5, 2022 WL 2131988, at *340 (2022). Within 20 years, 34 states followed by passing their own probation legislation. *Id.* In 1925, Calvin Coolidge signed the National Probation Act into law, creating a federal system. *Id.* Parole systems emerged around the same time as probation. In 1984, parole was abolished in the federal system and was replaced by supervised release. *Id.*

Supervised release was not originally intended to be punitive. *See* S. Rep. No. 98–225, at 124 (1983) (indicating that the "primary goal" of supervised release is to rehabilitate a defendant). However, as probation officers' caseloads have increased and the conditions for probationers to follow have piled up, revocations have become more common. Krinsky & Fuhrmann, *Building a Fair and Just Federal Community Supervision System*, at *341. About 16,000 people were on supervised release in the United States in 1984. *Id.* In 2019, over 108,000 people were on supervised release. *Id.* Higher caseloads for probation officers mean worse results for supervisees: less support and more violations. *Id.* (citing studies published by the CUNY Institute, the U.S. Sentencing Commission, and the Federal Probation Journal). More and more people have become trapped in a cycle of reincarceration and release. *Id.*

### 2. Probation Priorities

Studies conducted in the last fifteen years indicate a growing need for probation's resources to be re-allocated so that the office can focus on providing services for those with the greatest needs. The federal judiciary has recognized this, stating that under the "risk" principle of correctional intervention, the "majority of resources . . . should be devoted to higher-risk defendants." ADMIN. OFFICE OF THE U.S. COURTS PROBATION & PRETRIAL SERVICES OFFICE,

Overview of Probation and Supervised Release Conditions, at 10 (2016). For low-risk supervisees, prolonged supervision can actually be criminogenic. "[E]xcessive correctional intervention for low-risk defendants may increase the probability of recidivism by disrupting prosocial activities and exposing defendants to antisocial associates." *Id.*

Early termination of supervised release for low-risk supervisees appears to have no impact on public safety. Baber & Johnson, *Early Termination of Supervision*, at 20. The cost avoidance to probation because of early termination is substantial. *Id.* at 21–22 (finding that early termination saved nearly $8 million in 2012). Early termination appears to be in line with the mission and goals of U.S. Probation and Pretrial Services, which include effectively stewarding public resources and "protecting the community through the use of controlling and correctional strategies designed to assess and manage risk." U.S. Probation & Pretrial Services, Charter for Excellence (2002), https://www.gup.uscourts.gov/documents/Charter_for_Excellence.pdf.

Public opinion is also in step with this reprioritization. 73% of respondents to a 2020 poll agreed that government money should be spent on services, not on reincarceration for technical violations. Molly Greene & Sean McElwee, *Voters Support Reducing Incarceration and Supervision Under Probation and Parole*, The Appeal (Apr. 2021), https://theappeal.org/the-lab/polling-memos/use-clemency-power-to-fight-mass-incarceration. 76% agreed that barriers to housing, jobs, and education should be removed to increase an individual's chances of success on supervision. *Id.*

3. **Probation Officer As Life Coach**

In arguing for probation reform, a 2018 article presents an analogy for how probation has transformed between its 1840s origins and today's more punitive system. Brian K. Lovins et al., *Probation Officer as a Coach: Building a New Professional Identity*, 82 Fed. Prob. J. 13 (2018).

Probation officers today operate as "referees," announcing violations, applying rules, and exerting control. *Id.* at 14. The authors suggest that the goals of probation would be better served by some form of "coaches," following the model of sports coaches or life coaches. *Id.* Coaches build relationships, advise, and encourage. They use an individualized approach to determine a person's strengths and weaknesses. Coaches have a win-loss record; referees do not. *Id.* Coaches measure success by the success of those on their team, while referees' success is measured by strict and consistent adherence to the rules.

Augustus' methods followed this coaching model, and studies suggest that this model is the most effective. ADMIN. OFFICE OF THE U.S. COURTS PROBATION & PRETRIAL SERVICES OFFICE, OVERVIEW, at 10–12 (discussing studies showing the effectiveness of cognitive behavioral therapy and of working closely with supervisees and their families and communities). Probation officers, when acting as referees, do not have systemic incentives to offer the support that those exiting long prison terms need. Where probation officers are not engaged in "coaching" and are not fostering positive change for those they supervise, early termination is in the interest of justice.

**4. Williams' Motion**

Williams is at low risk to reoffend, according to the Probation Office's risk classification system and based on his successful completion of over three years of supervised release. The Probation Office has little demonstrated interest in continuing his supervision. Williams' continued enrollment in supervision ties up probation resources that could best be used elsewhere, and Williams is not being "coached" by probation to help him continue reintegrating into society. Instead, he is currently being held back by his status as a supervisee. He is among those probationers who could become a greater risk to the public because of his status as a supervisee.

Early termination of Williams' supervised release is aligned with both public safety and the goals of probation, so it is in the interest of justice.

### IV. CONCLUSION

Supervised release is not a punitive sentence. It is a mechanism that, when working as it should, supports supervisees in their efforts to re-integrate into society. Probation officers can serve as life coaches and resources for supervisees, and they should celebrate a supervisee's victories as their own. And, when a term of supervision is no longer necessary, courts reviewing such motions for early termination should look upon them with mercy and seize the opportunity to do justice.

For the reasons discussed above, I will grant Williams' motion for early termination of supervised release. An appropriate order follows.

                                                             s/ANITA B. BRODY, J.
                                                             ANITA B. BRODY, J.